**Dennis Ray NEWTON, Plaintiff,**

v.

**SOUTHEAST ALABAMA GAS DISTRICT, a corporation, and James H. Smith, Defendants.**

**Civ. A. No. 88–D–1198–N.**

United States District Court,
M.D. Alabama, N.D.

March 13, 1989.

Frank J. Tipler, Tipler & Tipler, Andalusia, Ala., Frank W. Riggs, Riggs, NeSmith & Halstrom, P.A., Montgomery, Ala., for plaintiff.

Robert D. Segall, J. Fairley McDonald, III, Copeland, Franco, Screws & Gill, Montgomery, Ala., for defendants.

---

MEMORANDUM OPINION

DUBINA, District Judge.

There is presently pending in this cause a motion to dismiss, filed herein by the defendants on January 5, 1989. In support of their motion, the defendants submitted a memorandum brief. On January 27, 1989, the plaintiff filed a response to the defendants' motion to dismiss and submitted a memorandum brief and other documentary evidence. For the reasons which follow, this court is of the opinion that the defendants' motion is due to be denied.

## I. INTRODUCTION

The plaintiff in this case, Dennis Ray Newton ("Newton"), instituted this action under the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, to obtain redress for what he characterizes as a deprivation of rights secured to him by the first amendment to the United States Constitution, made applicable to the states through the due process clause of the fourteenth amendment.

According to the allegations of the complaint, Newton had been employed for approximately twelve years as an accountant with the defendant Southeast Alabama Gas District ("the SAGD"), a public corporation providing gas distribution services to a number of Alabama municipalities. On or about July 1, 1988, Newton was discharged from his position by the defendant James H. Smith ("Smith"), the "chief executive officer" of the SAGD. Newton avers that the sole basis for his termination was his expression to officials of the SAGD, including Smith, of his concerns and disapproval regarding such matters as the concealment of refunds purportedly due to certain of the SAGD's industrial customers; the wasting of SAGD's funds on elaborate and expensive travel arrangements for, among others, Board members and their families; and the loss of approximately $40,000.00 in interest as a result of the SAGD's allegedly irregular full advance payment for a pipeline construction project. Given these circumstances, Newton contends that his discharge was wrongful and in willful violation of his right to freedom of speech as guaranteed by the first and fourteenth amendments. Newton seeks an award of damages, equitable relief in the form of reinstatement to his former position, and an award of attorney's fees and costs.

The defendants' motion to dismiss is premised on two grounds. They are as follows: (1) the complaint fails to state a claim against the defendants upon which relief can be granted since neither defendant engaged in "state action" or acted "under color of state law" with reference to Newton; and (2) the court lacks jurisdiction over the subject matter under 28 U.S.C. § 1343(a)(3), the jurisdictional counterpart to 42 U.S.C. § 1983.

## II. FACTS

It is undisputed between the parties that the SAGD is a "public corporation" organized under the statutory scheme created by 1951 Alabama Act No. 762, now codified at § 11–50–390 *et seq.*, *Code of Alabama* (1975), as amended. Section 11–50–391 provides, in pertinent part, that:

[a]ny two or more municipalities are hereby empowered and authorized to cause to be organized and incorporated a gas district as a public corporation with all the power and authority provided in this article for the purpose of securing for such municipalities a supply of natural or artificial gas and for the purpose of transporting gas and for the purpose of the local distribution and sale of gas and gas services in any one or more of such municipalities or for any one or more of such purposes.

The procedure for organizing and incorporating such a district appears in the statutory scheme: (1) the governing body of each municipality approves a resolution expressing the desirability of organizing and incorporating a district, identifying the proposed members of the district, briefly describing the gas systems to be owned by the district, and further authorizing the mayor to proceed with organization and incorporation [§ 11–50–391]; (2) when all potential member-municipalities have approved such resolutions, their respective chief executive officers execute a certifi-

cate of incorporation containing the information specified by statute [§§ 11–50–391, 11–50–392(a)]; and (3) the certificate of incorporation is filed with, and recorded by, the probate judge of the county in which the district's principal office is to be located, whereupon the corporation assumes its existence [§ 11–50–392(a)]. The SAGD was so incorporated in 1953 and has, as its members, fourteen municipalities in southeast Alabama.

In addition to their continuing control of a district's board of directors, member-municipalities remain directly involved in a district's affairs following its incorporation. For example, their governing bodies must approve amendments to the district's certificate of incorporation, including "any proposed change in the name of such district, the inclusion of other municipalities as members thereof or any matter which might originally have been included in the certificate of incorporation" [§ 11–50–392(b)]. In addition, member-municipalities must approve any disposal of a district's property in case of its dissolution [§ 11–50–392(c)].

A gas district incorporated under § 11–50–390 *et seq.* must have a board of directors. Unless the district's certificate of incorporation provides otherwise, the board shall consist of at least one member for each municipality which is a member of the district; the governing bodies of the participating municipalities shall elect the individuals who are to represent the municipalities on the board of directors; and those board members shall serve a term concurrent with the term of office of each municipality's mayor [§ 11–50–393, as amended]. The Board of the SAGD, for example, consists of fourteen members, representing the fourteen member-municipalities.

A board may, but need not, consist of the mayors of the participating municipalities. Board members serve without compensation, although they are entitled to reimbursement for expenses and may receive a fee for attendance at board meetings. An "appointing authority" may remove its representative on the district's board, appar-

ently for cause and after the member has had the opportunity for hearing; such removal by a municipality's governing body is final and nonreviewable [§ 11–50–393, as amended].

Pursuant to the statute, a board of directors is authorized "[t]o appoint officers, agents and employees, including attorneys, and to fix their compensation" [§ 11–50–395(a)(3)]. However, SAGD employees do not fall within any employee merit system in effect in its member municipalities and are not considered to be employees of either its member-municipalities or the state of Alabama.

The statutory scheme authorizes the districts to exercise the same powers of eminent domain as do municipalities [§§ 11–50–396(17), 11–50–397]; to acquire, construct, own and operate gas distribution systems outside the respective territories of the member-municipalities [§ 11–50–398]; to acquire competing gas systems [§ 11–50–399]; to use the rights-of-way of public highways [§ 11–50–400]; to promulgate rules and regulations concerning installation and service of gas fixtures, appliances, and equipment [§§ 11–50–401, 11–50–402, 11–50–403]; and to issue bonds [§ 11–50–405], with the accompanying power to mortgage their property and pledge their revenues as security for such bonds [§§ 11–50–407, 11–50–408].

The obligations of a district are not obligations of its member municipalities or the state of Alabama [§ 11–50–409], and the SAGD, by way of example, does not receive financial assistance from its members or the state. The statutory scheme contemplates that the districts organized under its provisions may be for-profit ventures, with all profits being distributed to their member-municipalities [§ 11–50–411, as amended]. Districts are exempt from state usury and interest statutes [§ 11–50–415] and are also for the most part tax-exempt [§ 11–50–412], though they may be obligated to pay municipal "privilege license taxes" [§ 11–50–413]. As "independent instrumentalities of the state," the districts are exempt from the jurisdiction of and regula-

tion and supervision by the Alabama Public Service Commission [§ 11–50–416].

Finally, notice to the public is required whenever a district board passes a "resolution of a general or permanent nature" [§§ 11–50–395(b), 11–50–402] or establishes or alters rates and charges [§ 11–50–396(12) ].

## III. DISCUSSION

The law is clear that to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *See, e.g., West v. Atkins,* —— U.S. ——, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988); *Motes v. Myers,* 810 F.2d 1055, 1058 (11th Cir.1987). As the United States Supreme Court has observed, "[T]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the fourteenth amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982) (*quoting Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982)). *See also Frazier v. Board of Trustees of Northwest Miss. Regional Medical Center,* 765 F.2d 1278, 1283–1284 (5th Cir.1985), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986). To answer this question, courts must determine whether there has been "state action."

There are two alternative sets of circumstances under which state action will be found. First, state action will clearly be discernible where the "actor" in question is the state itself, a state agency, a political subdivision of a state, or a public employee. *See, e.g., West v. Atkins,* 108 S.Ct. at 2255; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).[1] Second, even where the actor is not a state entity, but rather a private one, through a traditional state action analysis it may be deemed a "state actor" by virtue of the functions it performs and its relationship with the state. For example, state action in such cases may be found where

the State creates the legal framework governing the conduct, if it delegates its authority to a private actor, or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior. Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.

*National Collegiate Athletic Ass'n v. Tarkanian,* —— U.S. ——, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988) (citations, footnote omitted).

Such a state action analysis need be undertaken only in the case of private entities. Where an entity is controlled, owned, and operated by a governmental body or bodies, it is clearly superfluous to ask, for example, to what extent it is government-regulated. Accordingly, in the instant case, if the SAGD is found to be a public entity, then it is unnecessary for the court to address whether its activities are "private action" or "state action." By definition, activity by a state actor *is* state action; actions by a true, public, state actor are unquestionably "fairly attributable to the State." *See Rendell–Baker v. Kohn,* 457 U.S. at 838, 102 S.Ct. at 2769.[2]

---

1. Municipalities and other local government units, for example, may be liable under § 1983. *See, e.g., Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (*overruling Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), insofar as it held local governments immune from suit under § 1983); *Wofford v. Glynn*

*Brunswick Memorial Hospital,* 864 F.2d 117 (11th Cir.1989).

2. In support of their motion to dismiss, the defendants cite a number of cases in which such a state action analysis was undertaken. Unlike in the instant case, however, in each of those cases the starting point for the court was that the defendant was clearly a private entity. *See National Collegiate Athletic Ass'n v. Tarkanian,* —— U.S. ——, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (private association of colleges and universities, having some public schools as mem-

■ The first question then, is whether the SAGD is a private or public entity. It is the court's opinion that the SAGD is a public entity, a *true* "public utility."[3] The court is persuaded that an entity which is wholly controlled by various municipalities, through their governing bodies, is clearly a public entity and, accordingly, a state actor. Not only are the SAGD's Board members appointed and regularly elected by the member-municipalities, they are also removable by them. Even though the Board members are entitled to notice and a hearing before discharge, the fact remains that any removal is final and nonreviewable.

■ It is established that not only municipalities, but also their political subdivisions, may be liable under § 1983. *See,* *e.g., Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). While it is perhaps more common for the membership of a local board to be completely determined by the governing body of *one* city, it is irrelevant in this case that the membership of the board in question is in fact determined by a number of different municipal governing bodies. Whether a board is a cooperative effort among a number of municipalities or the outgrowth of only one does not affect its status as a public entity.[4] The fact remains that it is controlled, directly or indirectly, by elected government officials, just as any other governmental body is.[5] Regardless of whether or

bers); *West v. Atkins,* ___ U.S. ___, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (private physician); *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (private school); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (private nursing home); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (privately-owned and privately-operated utility); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (privately-owned lunchroom); *Nail v. Community Action Agency of Calhoun County,* 805 F.2d 1500 (11th Cir.1986) (non-profit private corporation); *Cassiano v. Amigos Del Valle, Inc.,* 776 F.2d 1300 (5th Cir.1985) (non-profit corporation, organized pursuant to the state's regular, private, non-profit incorporation statute, with various cities and counties as members); *Anderson v. National Railroad Passenger Corp. (Amtrak),* 754 F.2d 202 (7th Cir.1984) (privately-controlled railroad); *Community Medical Center v. Emergency Medical Services of Northeastern Pennsylvania,* 712 F.2d 878 (3d Cir.1983) (private organization of hospitals).

The defendants ask the court to dismiss out of hand the possibility that the SAGD is a public entity and, by virtue thereof, inherently a state actor. This the court is not willing to do. The defendants *assume* that the SAGD is a private entity and their motion to dismiss focuses almost entirely on why, as a private entity, the SAGD's activities should not be considered state action. The cases cited by the defendants in making this argument, however, are not applicable to the court's preliminary inquiry—whether the SAGD *is* in fact a private entity.

**3.** The term "public utility" is used in various ways. It may, for example, refer to any entity "doing something the state deems useful for the public necessity or convenience." *See Baldwin v. Morgan,* 287 F.2d 750, 755 (5th Cir.1961). In contrast, the court uses the term here to refer to a *government entity* which is in the business of providing water or power to consumers.

**4.** For example, in *Marshall County Gas Dist. v. City of Albertville,* 263 Ala. 601, 83 So.2d 299 (1955), the court gave undisputed recognition to the government-employee status of a district board member. The case, which involved allegations by a member-municipality that the district's board had exceeded its statutory authority by acting without the approval of its member-municipalities, was referred to by the court as a "controvers[y] touching the legality of acts of *public officials....*" *Id.,* 83 So.2d at 303 (emphasis added).

**5.** Citing *Town of Hackleburg v. Northwest Ala. Gas Dist.,* 277 Ala. 355, 170 So.2d 792 (1964), the defendants claim that "a gas district organized under § 11–50–390 *et seq.* is not properly classified as a state agency as a matter of State law." While conceding that it is not dispositive, the defendants nevertheless read the case too broadly. The *Hackleburg* court stated:

The record shows that in addition to the Town of Hackleburg, the towns of Hamilton, Guin, and Sulligent, and the cities of Haleyville and Winfield are all members of the Northwest Alabama Gas District.

Because of this diversity of membership *and control,* the Northwest Alabama Gas District must be considered as though a separate proprietory [sic] corporation and not merely as an arm, branch or agent of any single municipal member of the gas system. In this aspect the status of the appellee differs from that of a Water Works Board, or Gas Board, organized within a single municipality. [Such] [w]ater boards and gas boards ... are, under certain conditions and factual situations, treated as the municipality itself.

*Id.,* 170 So.2d at 793 (citation omitted) (emphasis added).

not these members are mayors or city employees of the member-municipalities, they are each elected by, and answerable to, the governing body of their respective municipality.

It further appears to the court that the Board members here are directly responsible for controlling and/or governing the SAGD. To begin with, it appears that the defendant Smith, who allegedly personally fired Newton, was hired directly by the Board of Directors. It follows that the Board has the power, through Smith, to dictate and propose personnel changes, which is the activity at the heart of this lawsuit.

Further, not only do the member-municipalities exercise control over the SAGD by virtue of their direct authority over the Board, but they also retain other means of dominion.[6] Pursuant to Alabama statute, for example, the municipalities must approve any new member-municipalities, any amendments to the SAGD's certificate of incorporation, and any disposal of the District's property in case of its dissolution.[7] As further indication of the public nature of the SAGD, the court also notes the unique, detailed public notice requirements explicitly imposed on the SAGD by statute. Whenever the Board passes a resolution or establishes or alters rates and charges, for example, it must either first hold a public hearing or subsequently provide notice to the public.

The fact that any profits of the SAGD are distributed to the member-municipalities is further evidence of the continuing intertwined relationship between the SAGD and its members. In fact, as noted in a sworn affidavit filed by Newton, during negotiations for the possible sale of the SAGD to the Alabama Gas Corporation several years ago, it was clearly understood that the sale could not take place without the approval of the governing body of each member-municipality sharing in the ownership of the SAGD.

Finally, the court notes the uniquely privileged status of the SAGD, very unlike that of a private corporation. Not only is the SAGD almost completely exempt from "all state, county, municipal and other taxation in the State of Alabama," but it is also exempt from state usury and interest statutes. As noted in Newton's affidavit, the SAGD does not pay state or federal income taxes; it claims to be a municipality and is therefore exempt from paying interest on customer deposits; and the Wage and Hour Division of the United States Department of Labor classifies the SAGD as a "state and local employer." Further, the SAGD possesses the same eminent domain

---

The *Hackleburg* court stated only that a district with diverse membership is an entity separate from its member-municipalities, *not* that it is not a public entity, in and of itself, at *all.* The court further notes that the court in that decision specifically remarked on the control exercised over a district by its member-municipalities.

6. For an example of a member-municipality enforcing its continuing authority over a gas district and its board, via a lawsuit, see *Marshall County Gas Dist. v. City of Albertville*, 263 Ala. 601, 83 So.2d 299 (1955).

7. The defendants state that, pursuant to cases such as *East Montgomery Water, Sewer & Fire Protection Authority v. Water Works & Sanitary Sewer Bd. of City of Montgomery*, 474 So.2d 1088 (Ala.1985), "[a]s a general proposition, public corporations of this type are considered to be separate and distinct from the municipal corporations which may have prompted their creation." It is true that the plaintiff in that case was found to be "an entity separate and independent from the city which it serves." *Id.*

at 1091. However, the case cited by that court for its holding, *Water Works Board of City of Leeds v. Huffstutler*, 292 Ala. 669, 299 So.2d 268 (1974), specifically addressed only "the independence of public corporations such as the water works board here involved and their right to manage their affairs free of control by the governing bodies of the cities they serve, *except for such control as may be lawfully exercised through the regular and periodic election of directors by such governing bodies.*" *Id.*, 299 So.2d at 272 (emphasis added).

The assertion of state action in the instant case is *based* on that very control, "lawfully exercised ... by such governing bodies," over the District. Accordingly, neither of the above cases can be relied on to support the argument that the District is not controlled by its member-municipalities. Rather, they address an entity's freedom from interference by a municipality *in excess* of its legal authority. In the instant case, in contrast, the member-municipalities have a great deal of control *pursuant to statute.*

powers as do Alabama municipalities and, as an "*independent instrumentality of the state*" (emphasis added), it is, unlike private utilities, exempt from the jurisdiction and regulation and supervision of the Alabama Public Service Commission.

In light of all of the above factors, the court finds the SAGD to be a public entity and, accordingly, a state actor.

The court having answered the question of whether the SAGD is a public entity in the affirmative, it is unnecessary for the court to answer the second question, namely, whether the SAGD could also be found a state actor by virtue of its functions and relationship with the state.

### IV. CONCLUSION

Because of the clear nexus between the state and the activities alleged in this lawsuit, the court is convinced that the intent of the first amendment would be circumvented were the defendants' motion to dismiss to be granted. First amendment prohibitions against governmental interference with free speech are clearly implicated in a case, such as this one, where a municipally-controlled entity allegedly retaliated against an individual for exercising his right to speak out. Having found the SAGD to be a public entity, it is the opinion of this court that the defendants' motion to dismiss is due to be DENIED.